Filed 1/18/23  P. v. Orellana CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RAUL SHAWN ORELLANA, JR.,<br><br>    Defendant and Appellant. | F082699<br><br>(Merced Super. Ct. No. 20CR-04944)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Steven K. Slocum, Judge.

Kevin J. Lindsley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and Matthew A. Kearney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant and defendant Raul Shawn Orellana was convicted after a jury trial of second degree robbery (Pen. Code, § 211),[1] and sentenced to an aggregate second strike term of seven years in prison, based on the court's imposition of the midterm.

On appeal, defendant contends the matter must be remanded for resentencing because of the subsequent enactment of Assembly Bill No. 124 (2021–2022 Reg. Sess.) that amended section 1170 to make the lower term the presumptive sentence if the defendant experienced "psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence" that was "a contributing factor in the commission of the offense." (§ 1170, subd. (b)(6)(A).) Defendant asserts that evidence of his history of mental illness and drug use, introduced at the sentencing hearing in support of various defense motions, supports the application of this revised statute. He further contends the court improperly imposed a restitution fine and fees without determining his ability to pay, and defense counsel was prejudicially ineffective for failing to object to those amounts. We affirm.

## FACTS

On August 20, 2020, Roberto Estacio (Estacio) was the manager at a Dollar Tree store in Merced. He had been a manager for the Dollar Tree stores for seven years and was working at the store's newest location that day. There were two other employees in the store.

Estacio testified that a man, later identified as defendant, entered the store and walked toward the freezers in the back. He saw defendant take a "Twix" ice cream bar from the freezer and started to put it in his backpack.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

Estacio was about 20 to 25 feet away from defendant and told him to stop and leave the item. Defendant replied that he "wasn't going to drop shit." Defendant pushed the item into his backpack and walked out of the store.

Estacio followed defendant outside the store and testified that he was about 12 feet behind him. Estacio told defendant numerous times to drop the item, or he would call the police. Defendant kept walking, and Estacio continued to follow him.

**Defendant Swings a Knife**

As defendant walked through the parking lot, Estacio told him to drop whatever he had, and Estacio would not call the police. Estacio testified that he regularly gave all shoplifters the chance to drop or hand over stolen items to avoid calling the police, and others had done so before.

Estacio testified that he was about 10 to 12 feet behind defendant, and defendant "swung his backpack around, unzipped it, and pulled out a knife. And he said that he was going to slice me up if I called the cops. And he started swinging the knife in the air and out loud saying things, but I couldn't understand what he was saying."

Estacio testified that defendant swung the knife in his direction. He "felt threatened because he pulled out a knife on me," and believed defendant "was going to come after me with the knife. Because he was walking towards me and he was yelling things, swinging the knife. So I was kind of scared for my life."

Estacio testified that defendant's demeanor was like he was on drugs because "he was going all wild, blurting out loud, just, like, gibber and going all crazy, swinging the knife around, and just yelling out," and there were times Estacio could not understand him. "He was just yelling across the parking lot, swinging the knife. You couldn't understand what he was saying, but he was yelling."

After defendant swung the knife, Estacio "started stepping back, walking backwards. And then I kind of, like, jogged back up towards the door" of the store. Estacio went into the store and called 911 and stayed inside the front door.

3.

Estacio testified that three other thefts had already occurred at the store that same day and shoplifting frequently happened there. However, he was not confusing any of the prior thefts with defendant's incident. Estacio acknowledged that at the preliminary hearing, he testified that thefts happened a lot at the store, and he was kind of used to it, but "[t]hey don't pull out knives, but they do cuss us out and yell things at us," and this was the first time someone pulled out a knife.

Estacio also acknowledged that at the preliminary hearing, he testified that he told the police that the other two store employees were scared, and they all felt threatened because of the incident.[2]

Estacio testified that there were security cameras inside the store but not outside. The police never collected the videos from the interior cameras, and he was not asked to preserve them.

**The 911 Call**

The recording of Estacio's call to 911 was played for the jury. Estacio told the operator that he was calling from Dollar Tree, "and I just had a shoplifter pull out a big old knife and try to swing it at me, took off running," and he took the item with him. Estacio described the suspect as a Hispanic male, wearing a white shirt and red basketball shorts. Estacio said the suspect was walking through the parking lot "flashing his knife in his hand, swinging it around and stuff."

**Officer Benavidez's Body Camera Video**

Merced Police Officer Benavidez responded to the dispatch of a possible robbery with a knife at the store.

Officer Benavidez saw defendant on the street, about 100 yards away from Dollar Tree. Defendant was wearing a white shirt and red basketball shorts and matched the suspect's description.

---

[2] The other two employees were not interviewed by the police and did not testify at trial.

Officer Benavidez was wearing a body camera during his investigation; it recorded his conversation and arrest of defendant, and the video was played for the jury.

According to the video, Officer Benavidez asked defendant for his last name. Defendant had problems saying and spelling his name. Defendant was finally able to spell his last name and gave his birthdate.

Defendant had a black backpack, and it contained a Twix ice cream bar, an assortment of frozen ice creams or popsicles, and a large kitchen knife with a seven-inch blade.

Officer Benavidez took defendant back to the store, and Estacio positively identified him as the suspect. Benavidez testified that he showed Estacio the contents of defendant's backpack. Estacio identified the Twix ice cream bar as the item that defendant took from Dollar Tree. Estacio told Benavidez that he did not want it back. Estacio advised Benavidez that other items in the backpack were not taken from his store.

Officer Benavidez testified that during his interaction with defendant, he was jittery, visibly sweating, and talking a lot, and it was possible he was under the influence of drugs. Benavidez did not have to get defendant medically cleared when he took him into custody.

**Estacio's Statement to Officer Benavidez**

Officer Benavidez testified that Estacio gave a statement about what happened. According to the video from Benavidez's body camera, Estacio told Benavidez that he heard the sound of someone taking something from the freezer. Estacio told defendant to drop the item before he called the police. "And he took off his backpack. I thought he was going to drop it …. And he pulled out a big ol' knife, kitchen knife and started flexing going all like this sideways. And then I just walked back" to the store and called 911.

Also on the video, Officer Benavidez asked Estacio, "He actually went like this?" Estacio replied: "Yeah, he went like this with his … , and then I started walking back. I

5.

usually just show them the phone and they just drop the stuff and take off but … he pulled a knife on me. He pulled his backpack out, unzipped, pulled out the knife. And then I was on the phone with 911 telling [the operator] what he looked like and he was flashing it the whole time. I told [the operator] on the phone, he was just twirling his knife."

At trial, Officer Benavidez testified that Estacio said that he did not catch up with defendant until he got to the door. Estacio said that he followed defendant outside the store, into the parking lot, and repeatedly yelled at him "across the parking lot" to drop the merchandise, and he would not call the police. Estacio said that defendant turned around, put down his backpack, and reached into it. Estacio thought defendant was going to produce the ice cream bar, but instead defendant "took out a large kitchen knife." Estacio said that defendant waived the knife in the air and in his direction. Estacio said that once he saw the knife, he went back to the store and called 911. While he was calling 911 from inside the store, defendant was still in the parking lot twirling the knife in his hand.[3]

On cross-examination, Officer Benavidez testified that Estacio never said defendant was 10 to 12 feet away when he took out the knife, that defendant threatened to slice or cut Estacio, that he was scared or afraid of defendant during the incident, or that anything was said between them. Benavidez further testified, however, that he asked Estacio "open ended questions," and he never asked Estacio how he felt during the incident, if he felt threatened by defendant, if they talked, or if defendant made any specific statements to him.

---

[3] At trial, Estacio testified that he told Officer Benavidez what happened, that defendant swung a knife in his direction, and defendant either said he was going to "slice" or "cut" him up. Estacio told Benavidez he felt threatened when defendant waived the knife.

6.

Officer Benavidez testified that Estacio showed him the location where he was standing compared to where defendant was standing in the parking lot when he pulled out the knife. Benavidez paced the distance between the two spots, it was approximately 22 to 23 of his own paces and estimated that was about 50 feet. Benavidez did not collect any video evidence from the store.

**Estacio's Statements to the Defense Investigator**

At trial, Estacio confirmed he spoke a defense investigator, told him what happened, and showed him where they were standing in the parking lot when defendant pulled the knife. Estacio did not recall being served with a subpoena by the investigator.

Estacio testified that he told the investigator when defendant was still inside the store, defendant said, " 'No way, I'm out of here,' " as he walked down the aisle with the stolen item. Upon further questioning, Estacio clarified that defendant made two statements as he walked out of the store.

> "When he was going down the aisle, I came down the aisle and I told him to stop or leave the stuff. [¶] [Defendant] said, 'No way. I'm out of here.' And he moved his hand. And then he kept walking, and he passed through customers. When he said he's not leaving shit, he swung the front door wide open."

Estacio testified that he also told the investigator that when they were outside, defendant was mumbling, he could not understand what defendant was saying, and it appeared he was on "heavy drugs." Estacio denied telling the investigator that the closest defendant got to him was 25 feet.

**Defense Evidence**

Donavan Sizemore (Sizemore), a retired police officer, was the defense's investigator. He interviewed Estacio on August 28, 2020, and personally served him with a subpoena for the store's video surveillance tape. Sizemore did not make a video or audio recording of Estacio's statements during their interview.

Sizemore testified that he asked Estacio to tell him what happened and only asked a few clarifying questions.  According to Sizemore, Estacio said when defendant was walking out of the store, Estacio told him to stop and return the merchandise.  Defendant responded, " 'No way.  I'm out of here.' "  Estacio said defendant was mumbling things and waving the knife in the air, he did not understand him, and thought he was on drugs.  Estacio said that when defendant walked toward him with the knife, he returned to the store and called 911.

Estacio did not say that defendant told him, " 'No way.  I'm not dropping shit.' "  Estacio did not say that defendant threatened to cut him with the knife, or he felt threatened when defendant pulled the knife, and Sizemore did not ask these questions.  Estacio said defendant was approximately 25 feet away from him when he pulled out the knife.  He did not say the distance was 10 to 12 feet.

Estacio showed Sizemore where they were standing when defendant pulled out the knife and began waving it in the air.  Sizemore testified that he measured the distance between the two locations, and it was approximately 50 feet.

**Defendant's Trial Testimony**

Defendant initially testified that he did not remember anything that happened on the day of the incident, except that he fought with his girlfriend and stayed on the streets the previous night.  Defendant then testified that he remembered "grabbing the ice cream" but "the other stuff with the taunting with the knife and stuff, yeah, I didn't do that.  I was just paranoid that day."  Defendant felt uncomfortable because he did not have his gun with him, but he had his knife, and "I pulled a knife out, but it was not intentional to do that to anybody."

Defendant testified that he did not enter the store with the intent to rob, steal anything, or scare anyone, and did not walk toward anyone with a knife.  Defendant claimed that he forgot to pay for the Twix ice cream bar but also claimed he had an EBT

card when he went into the store, he lost it, and left without paying. He saw the police outside the store, but figured he was "free to go" since the bar only cost $2.

Defendant testified he had the knife for "protection" because "tweakers" were everywhere. He found the knife and it did not belong to him. "Otherwise, you have robbery charges just for ice cream.… I did not intend at all to use that against nobody. I didn't even mean no harm to anybody."

Defendant was "coming down off drugs" at the time of the incident and "about to get high." He was "paranoid" because there were a lot of people with knives on the street, and the police were nearby. Defendant did not remember much about what happened, but "I know what they're saying isn't true." Defendant said he misspelled his name to the arresting officer because he intended "to change my name because I've had a lot [of] incidents with that name," and tried to avoid "gang banging." Defendant admitted he had a prior felony conviction for moral turpitude in 2010.

On further questioning, defendant said he grabbed two ice cream bars from the store. He remembered that someone called the police, but he was sure that he did not say anything when he was inside the store. Defendant admitted that when he went outside, he turned around "with the knife because … I felt uncomfortable," and there were a lot of people around, and the police were across the street. "As soon as they get close to you, you'll die if they shoot you. You get a knife, and you can die."

## PROCEDURAL BACKGROUND

On August 24, 2020, the complaint was filed that charged defendant with second degree robbery.

**First Competency Finding**

On September 3, 2020, defense counsel declared a doubt as to defendant's competency to stand trial, and the court suspended criminal proceedings pursuant to section 1368 and appointed Dr. Zimmerman to examine him.

9.

On October 1, 2020, the parties submitted the matter on the expert's report, and the court found defendant was competent to stand trial and reinstated criminal proceedings.

**Information**

On October 21, 2020, an information was filed in the Superior Court of Merced County charging defendant with count 1, second degree robbery (§ 211), with enhancements for personal use of a deadly or dangerous weapon, a knife, in the commission of the offense (§ 12022, subd. (b)(1)), and that he had one prior strike conviction and one prior serious felony enhancement (§ 667, subd. (a)(1)) based on his conviction for violating section 246, shooting at an inhabited dwelling, in March 2010.

**Pretrial Motion to Dismiss Prior Strike Conviction**

On November 24, 2020, defendant filed a pretrial motion to dismiss his prior strike conviction pursuant to section 1385 and *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*). Defendant's motion argued he was 30 years old, his prior strike conviction was over 10 years old, his current offense involved drugs, and he had a long history and problem with drugs. The motion stated defendant quit school when he was in the 11th grade because he was " 'kicked out of the house,' " and had "a family history of substance abuse disorder." He reported a history of hospitalizations and medication for bipolar disorder and methamphetamine use disorder. Defendant requested probation and placement in a residential treatment facility for both his drug and mental health issues.

As a supporting exhibit to his motion, defendant filed Dr. Zimmerman's section 1368 report, dated September 28, 2020, that stated defendant reported he had "a history of hospitalizations and medications for a bipolar disorder" and severe use of methamphetamine. Dr. Zimmerman found defendant was competent to stand trial, he was not competent to represent himself, and he would likely benefit from psychotropic medication, but it was not needed for his competency to stand trial. Dr. Zimmerman also

found defendant was not a danger to himself or others as a result of his bipolar disorder, but "his known history suggests that he could represent a danger to others when under the influence of methamphetamine or other controlled substances."

Defendant also attached the transcript from the plea hearing for his prior strike conviction for shooting at an inhabited dwelling in March 2010, where he was placed on felony probation for three years. At that 2010 plea hearing, defense counsel stated that defendant's cousin had an altercation with someone, defendant drove his cousin by a house, and the cousin shot at the house. Defendant buried the gun but gave it to officers when they arrived at his house. Defendant said that he did not know his cousin was going to shoot at the house. Defense counsel stated that defendant's family was present at the plea hearing, and they intended to support him.

### *Denial of Pretrial Motion*

On December 9, 2020, the court denied defendant's pretrial motion to dismiss the prior strike conviction and made the following findings.

> "In light of the circumstances surrounding the present offense and considering the prior strike and the particulars of the defendant's background, character, and prospects, I do not find that the defendant falls outside of the spirit of the three strikes scheme. [¶] I have considered the facts surrounding the current alleged offense, the defendant's past criminal record, the defendant's background, character, and prospects going forward. I've also considered whether there are factors in mitigation or factors in aggravation. And I find that the defendant does not fall outside the spirit of the three strikes scheme. So the invitation to strike the strike is denied."

## Second Competency Finding

On January 5, 2021, defense counsel again declared a doubt as to defendant's competency. The court suspended criminal proceedings and appointed Dr. Neufeld.

On February 3, 2021, the parties submitted the matter on the report, and the court found defendant was competent and reinstated criminal proceedings.

11.

**Jury Trial and Verdict**

On March 23, 2021, the court heard and denied defendant's motion to dismiss his appointed counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118, and defendant's jury trial began.

On March 26, 2021, defendant was convicted of second degree robbery and the personal use enhancement was found true. The court reviewed the prosecution's documentary evidence and found the prior conviction allegations true.

## SENTENCING MOTIONS

After defendant was convicted, both parties filed sentencing motions.

**Defendant's Motion**

On April 21, 2021, defendant, who was 31 years old, filed a sentencing motion and raised several issues.

*Diversion*

First, defendant's motion sought an expert evaluation in order for the court to place him on mental health diversion pursuant to section 1001.36, based on the competency reports from both Dr. Zimmerman and Dr. Neufeld that he was diagnosed with bipolar disorder and methamphetamine use disorder.[4] Defendant argued that he could be placed on "postconviction" diversion based on the holding in *People v. Curry* (2021) 62 Cal.App.5th 314, review granted July 14, 2021, S267394 (*Curry*). Defendant acknowledged a contrary conclusion was reached in *People v. Braden* (2021) 63 Cal.App.5th 330, review granted July 14, 2021, S268925 (*Braden*), that held a defendant is ineligible if he failed to request diversion before trial began.[5]

---

[4] While defendant's motion cited to Dr. Neufeld's report, he did not attach a copy of that confidential report to the motion.

[5] Defendant has not challenged the court's denial of "presentencing" diversion on appeal. As background, we note that section 1001.36 defines "pretrial diversion" as "the postponement of prosecution … at any point in the judicial process from the point at

*Section 1385*

Next, defendant asked the court to reconsider his pretrial motion to dismiss the prior strike conviction pursuant to section 1385 and *Romero*, so he could be placed on probation and attend a residential treatment program.

***Probation – Unusual Circumstances***

Defendant acknowledged he was presumptively ineligible for probation if the court did not dismiss the prior strike conviction but argued there were unusual circumstances because he was diagnosed with bipolar disorder when he was 16 years old, and he suffered from both bipolar disorder and methamphetamine use disorder. He further argued that the instant crime did not involve "actual violence," he did not get close to Estacio with the knife, Estacio followed him, and he was paranoid at the time of the incident. He argued that he thought he had an EBT card to pay for the ice cream bar, the offense would not have occurred but for his bipolar and methamphetamine use disorders, he had not committed any prior violent crimes, and he had been accepted into a residential treatment program.

_____

which the accused is charged *until adjudication*, to allow the defendant to undergo mental health treatment." (§ 1001.36, subd. (c), italics added.)

The statute does not define the phrase "until adjudication," and that phrase has received three different interpretations. In *Curry, supra*, 62 Cal.App.5th at p. 321, upon which defendant relied, the court held section 1001.36 "contemplates mental health diversion until entry of the judgment of conviction." In *Braden, supra*, 63 Cal.App.5th at p. 333, upon which the sentencing court ultimately relied to deny relief, it was held that a defendant is ineligible for diversion once his trial begins. In *People v. Graham* (2021) 64 Cal.App.5th 827, 833, review granted September 1, 2021, S269509, the court held a motion for pretrial diversion is timely only if made prior to the jury's guilty verdict.

The California Supreme Court granted review in these three cases, deferred briefing in *Curry* and *Graham* pending the resolution of the petition for review in *Braden* and ordered briefing in *Braden* to address the latest point at which a defendant's request for mental health diversion is timely under section 1001.36. As of February 2022, briefing was completed in *Braden*, but oral argument has not been set.

*Supporting Exhibits*

Defendant's sentencing motion was supported by letters from his family and friends about his mental health issues – that when he took his medication and was sober, his symptoms were under control, he did well, and he was employed. He moved into his own place but started using drugs again and became homeless because of his mental health and drug problems.

Defendant's sister wrote that court-ordered rehabilitation and counseling would help his mental health and drug problems and "possibly help him resolve some past trauma he has never dealt with for example in 2013 when he was randomly stabbed at a liquor store and almost died" when he was in the wrong place at the wrong time. A former roommate wrote that defendant was stabbed in March 2013, when he went to the store to buy cigarettes, and defendant was always suspicious of his surroundings since that time.

A friend wrote that defendant was the oldest of five siblings, it was not easy for him when his parents separated when he was a teenager, and he lived with his father for 15 years. He then returned to his mother, and then he was distant, cold, and "broken." He was not the same.

Another friend wrote that when defendant was a young child, he was "a typical happy kid with all of the appropriate laughs, smiles, and harmless mischief that goes with it. As a teenager, he gradually became more withdrawn and rarely displayed feelings," and was " 'flat' " and " 'detached.' "

Defendant's mother wrote that he had struggled with mental illness and drug problems since he was 13 years old, he was diagnosed as bipolar when he was 15 years old, and she never got him help. "His father & I had a volatile relationship with domestic violence involved. His father didn't believe the doctors so he believed marijuana would help [defendant]. He began to use other drugs by 16 yrs. I called police to have him locked up for a [section 5150 hold] I believe. I thought he was going to commit suicide

14.

because of his erratic behavior…. I didn't know how to help [him]. His father was a drug dealer."

Defendant's mother wrote that she remarried, and defendant got along with his stepfather, who was a police officer, but defendant's biological father "convinced him and put pressure on [him]" to stay away from them. Defendant's father was a bad influence and abandoned him when the father also became an addict. Defendant became homeless in 2008, she found him in a mental health facility in Oklahoma in 2016, and he became stable while on medication.

Defendant's stepfather wrote that defendant had drug and mental health problems, and they had to keep him away from the other children. When defendant returned to the area, he was a completely different person on medication; they helped him. He did well, and he had a job and his own place. He went through some stress and started using drugs again, and he now needed a residential treatment program.

**The Prosecution's Opposition**

On April 22, 2021, the prosecution filed opposition and argued the court should not dismiss the prior strike conviction because of defendant's criminal history – he had several misdemeanors, the level of his crimes was increasing with an escalation of violence, and he had two prior violations of probation. He failed to previously take advantage of opportunities to address his drug and mental health issues, there was no evidence he would do so this time, and he posed a risk of danger to the public.

The People also opposed finding any unusual circumstances to grant probation, disagreed with defendant's summary of the facts of the instant case, and argued the evidence showed he used the knife to instill fear in Estacio and complete the robbery. Defendant's prior strike conviction also involved a violent crime since he was the driver when his cousin shot at an occupied dwelling.

15.

## SENTENCING HEARINGS

The court held sentencing hearings on April 2 and 23, 2021, and considered defendant's motions for "presentencing" diversion, probation, and imposition of the lower term.

**Motion for "Presentencing" Diversion**

On April 2, 2021, the court convened the sentencing hearing. Defense counsel requested appointment of an expert to examine defendant in support of his motion for "presentencing" mental health diversion under section 1001.36. The court replied that section 1001.36 defined pretrial diversion as being available prior to adjudication, and defendant's motion was not timely. Defense counsel argued that the motion was timely under *Curry, supra*, 62 Cal.App.5th 314.

The prosecutor stated defendant was ineligible for diversion after conviction, and the court already denied his motion to dismiss the prior strike conviction, and he was going to be sentenced to prison. Defense counsel said he would renew the section 1385 motion. The court continued the sentencing hearing to consider *Curry* and the diversion issue.

### *The Court's Ruling*

On April 23, 2021, the court reconvened the sentencing hearing and stated that it had reviewed both *Curry, supra*, 62 Cal.App.5th 314 and *Braden, supra*, 63 Cal.App.5th 330, and acknowledged there was a split of authority about whether section 1001.36 permitted postconviction diversion. The court agreed with *Braden*, that the plain language of the statute only permitted pretrial diversion and denied defendant's motion for presentencing diversion.

However, the court decided to make further findings in case the California Supreme Court decided that *Curry* was correctly decided, and presentencing diversion was statutorily permitted. The court conducted a prima facie hearing on whether defendant would be statutorily eligible for diversion, and found defendant was not

16.

eligible under the requirements of section 1001.36 based on the documentary exhibits submitted by defendant.

> "The Court has considered the facts of this case, the defendant's demeanor while testifying, the facts as briefly outlined in the plea transcript from defendant's prior strike conviction, Probation's recommendation, records from Griffin Memorial Hospital in Oklahoma, and also that the defendant was treated for schizoaffective disorder for a month and discharged in September 2016 from that facility, and also records that the defendant had support from the Department of Rehabilitation and GBHC Senior Health from 2017 to 2019.

> "I have also considered the defendant's sentencing memorandum. I read all of the letters in support of [defendant] from family members and his family friends. From these letters, it is clear that the defendant had strong support, and he was briefly successful while in treatment for his mental health issues. Then the defendant went off his medication and began using drugs again. In one letter, it indicates that the defendant walked away from the Merced Rescue Mission program. The common thread throughout the letters is that the defendant is well mannered, productive, and law abiding when he is taking anti-psychotic medication and is sober. When he stops taking his medication and … when he relapses into drug use, the defendant's personality shifts, and his own family becomes fearful of the defendant."

The court stated defendant would be statutorily eligible for diversion if it found he would not pose "an unreasonable risk of danger to public safety" if treated in the community, within the meaning of section 1001.36, subdivision (b)(1)(F), and that meant there was not an unreasonable risk defendant would commit a new violent felony.

The court found defendant would pose an unreasonable risk of danger to the public because he "already received the community treatment that's now being requested. After becoming stabilized on medication and receiving medical support in both in-state and out-of-state hospitals, the defendant relapsed and eventually committed a violent felony offense with a deadly weapon."

The court also considered defendant's prior conviction for shooting at an inhabited dwelling in 2010, that occurred when he "drove his cousin to a home where the

defendant's cousin fired a gun at an inhabited dwelling," he was placed on probation because of his youthful age, and the gang enhancements were dismissed in that case.

> "I have a genuine concern for the safety of the public based on the defendant's mental health issues, the defendant's severe methamphetamine addiction, his prior criminal conduct, and his conduct in this case. [¶] Here the defendant testified that he had previously been in possession of a firearm prior to the robbery. Fortunately, he was not in possession of that gun on the occasion when he committed the robbery. [¶] … [¶]
>
> "Prior to the robbery, the defendant also had decided to arm himself with a large kitchen knife.
>
> "There's no – in this Court's opinion, there's no question that the defendant needs drug treatment and mental health treatment. But if he's treated in the community, there's an unreasonable risk that the defendant will stop treatment, relapse, and present an unreasonable risk of committing a homicide.
>
> "The defendant has been given treatment in the community for his mental health issues in the past, and he committed the present violent offenses following that treatment. So the Court's opinion is that the defendant should receive mental health treatment but in a locked facility setting."[6]

The court, thus, found it would not place defendant on diversion even if such a postconviction motion was statutorily cognizable.

**Request to Dismiss the Prior Strike Conviction**

The court next addressed defendant's renewed request to dismiss the prior strike conviction for shooting at an inhabited dwelling in 2010.

Defense counsel stated that defendant was 19 years old when he committed the prior strike conviction, and the case was resolved when he was 20 years old. Counsel stated the prior conviction was not violent because defendant said he did not know what his cousin was going to do, he helped the police find the weapon, and these factors were

---

[6] Defense counsel objected and claimed defendant's testimony about a gun was stricken. The court disagreed, and the record shows that it was not stricken.

18.

considered when he was placed on probation in that case. Counsel stated defendant's performance on probation was successful until it was terminated, and he was not sent to prison.

Counsel argued defendant had never been sent to prison, he had misdemeanor offenses after the prior strike conviction, and there was no significant increase in violence. Counsel further argued there was no physical confrontation or actual violence in this case, and there was conflicting evidence about how close defendant got to Estacio with the knife. Defendant's inconsistent trial testimony was the result of his bipolar disorder, and he had been accepted into a residential treatment program.

The prosecutor replied that the instant offense was a violent crime because defendant pulled a knife and instilled fear in the store manager, who simply asked him to drop the stolen merchandise. The prosecutor further argued defendant already had the opportunity to move forward when he was placed on probation after the prior strike conviction in 2010, and he repeatedly failed to do so.

### The Court's Ruling

The court acknowledged defendant was placed on probation for the prior strike conviction in 2010, but he violated probation by brandishing a knife. Defense counsel disputed whether that happened. The court reviewed the records, and stated that in January 2012, while still on felony probation, defendant was convicted of the new offense of brandishing and again placed on probation.

The court declined to dismiss the prior strike conviction based on the facts of the current offense, defendant's criminal record, the similarity between the current crime and his past violent crime, and his background and prospects. The court also considered mitigating factors and found defendant did not fall outside the spirit of the "Three Strikes" law.

19.

**Probation and Unusual Circumstances**

The court stated that defendant was presumptively ineligible for probation because of the prior strike conviction. Defense counsel stated there were unusual circumstances to grant probation. The court stated that "unusual circumstances" could only be considered if the prior strike conviction was dismissed but allowed counsel to make a record on the issue.

Defense counsel argued it was "undisputed" that defendant was under the influence of methamphetamine when he committed this offense, and the section 1368 reports stated he suffered from mental illness.[7] Defendant was homeless, under the influence, and paranoid, and he took out the knife to protect himself but did not intend to use it. He did not commit any violent acts, and he was afraid because he did not know who Estacio was and why he was being yelled at.

Defense counsel further stated this case would be defendant's first prison commitment, and a prison term would be cruel and unusual under the circumstances because it would exacerbate his mental health problems and make it harder for him to get treatment. Counsel concluded:

> "… I hope it's not taken as any kind of disrespect. But what I have seen over the course of my time here in Merced County by the judges, when somebody first becomes a judge in their first few years – and I am not meaning any disrespect there seems to be a tendency to really give maximum sentences and … in showing … the public that the Court can be tough on crime and will sentence to the maximum if given the opportunity. Those judges, as they get older and have spent around 20 years as a judge, I think they realize the error in their previous ways."

---

[7] There was no evidence that defendant was evaluated or tested for being under the influence of either alcohol or a controlled substance when he was arrested in this case. Officer Benavidez testified that he did not have to get defendant medically cleared when he was taken into custody.

*The Court's Ruling*

The court stated that under section 1170.12, defendant was ineligible for probation because he had one prior serious felony conviction. The court agreed defendant needed treatment, but the question was whether it should be in the community or a locked facility. The court continued:

> "He's been convicted of shooting at an occupied home. While on probation for that, he brandished a knife. And now he's been convicted of using a knife during a robbery. And I don't think he is a person who is suitable for treatment in the community for those reasons."

The court stated that the California Department of Corrections and Rehabilitation (CDCR) could treat an inmate with a mental illness, and it intended to direct that CDCR provide treatment for defendant's bipolar disorder.

**Length of Prison Term**

The court's tentative sentencing decision was to impose an aggregate term of seven years based on the midterm of three years, doubled to six years as the second strike sentence, plus one year for the personal use enhancement. It intended to strike the five-year term for the prior serious felony enhancement. The court invited arguments about the length of defendant's prison term and the aggravating and mitigating factors.

Defense counsel argued that since the court denied probation, the "fairest term would be the lowest term possible and striking the so-called nickel prior enhancement and giving him four years, at most six years, mid term doubled," and a longer term would ignore his clear mental illness problems.

The prosecutor stated that a prison term was appropriate, and defendant could receive treatment there.

**The Court's Imposition of Sentence**

The court again stated that probation was denied because defendant was statutorily ineligible. The court found one mitigating factor, that the value of the property taken insignificant.

The court stated that the aggravating factors were that defendant engaged in violent conduct that indicated a serious danger to society, his prior convictions as an adult were of increasing seriousness, he was previously an aider and abetting to a shooting, his prior performance on probation was unsatisfactory, he was convicted of brandishing a weapon while on felony probation, he was on probation when he committed this robbery, and he personally committed the robbery and personally used a weapon in the commission of the robbery.

The court imposed the midterm of three years in prison for count 1, "[i]n balancing the factors and based on the facts of this case," and doubled the term to six years as the second strike sentence, plus one year for the personal use enhancement, for an aggregate term of seven years. The court exercised its discretion to dismiss the five-year prior serious felony enhancement because the conviction was more than 10 years old, and it would be inappropriate to impose the enhancement in this case.

The court further stated: "I will note on the Minutes that the [CDCR] evaluate and treat defendant for a diagnosed bipolar disorder."

The court imposed a restitution fine of $2,100 (§ 1202.4, subd. (b)) and found "this amount is commensurate with the seriousness of the crime charged." The court suspended the parole revocation find in the same amount (§ 1202.45) and reserved victim restitution; it also imposed the court facilities assessment of $30 (Gov. Code, § 70373), and the court operations assessment of $40 fee (§ 1465.8). Defense counsel did not object to the fines and fees.

On April 23, 2021, defendant filed a timely notice of appeal.

## DISCUSSION

### I.      Remand for Resentencing is Not Required

Defendant contends the matter must be remanded for resentencing because Assembly Bill No. 124 (2021–2022 Reg. Sess.) was enacted after his April 2021 sentencing hearing and amended section 1170 to make the lower term the presumptive

22.

sentence if the defendant experienced "psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence" that was "a contributing factor in the commission of the offense." (Stats. 2021, ch. 731, § 1.1; § 1170, subd. (b)(6)(A).) Defendant asserts evidence of his history of mental illness and drug use, introduced at the sentencing hearing, constituted evidence of "childhood trauma' required by this statute.

As will be explained, defense counsel fully developed these issues at the sentencing hearing, the court repeatedly denied defendant's sentencing motions, including imposition of the lower term, and remand is not required.

**A.** *Assembly Bill No. 124*

Effective January 1, 2022, Senate Bill No. 567 (2021–2022 Reg. Sess.) amended section 1170, subdivision (b) to make the middle term the presumptive sentence, unless the greater term is justified by aggravating circumstances that were stipulated to or found true beyond a reasonable doubt. (§ 1170, subds. (b)(1), (b)(2); Stats. 2021, ch. 731, § 1.3.)

Also effective on January 1, 2022, Assembly Bill No. 124 (2021–2022 Reg. Sess.) further amended section 1170 to add subdivision (b)(6)(A), that states in relevant part:

> "Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice, *the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense*: [¶] (A) The person has experienced *psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence.*" (Stats. 2021, ch. 731, § 1.3, italics added; *People v. Banner* (2022) 77 Cal.App.5th 226, 239 (*Banner*).)

Assembly Bill No. 124 made the lower term "presumptively appropriate under specified circumstances, including where the defendant's experience of psychological or physical trauma was a 'contributing factor' to the defendant's commission of the offense.

23.

(§ 1170, subd. (b)(6)(A).) Where the presumption applies, the trial court may impose a higher sentence if it finds 'the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice.' (§ 1170, subd. (b)(6).) Even where the presumption does not apply because there is no evidence that the circumstances listed in paragraph (6) are present, the trial court retains discretion to impose the lower term. (§ 1170, subd. (b)(7).)" (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1095.)

The parties herein agree that Assembly Bill No. 124 is ameliorative legislation that applies retroactively to judgments that were not final at the time the statutory amendments went into effect. (*Banner, supra*, 77 Cal.App.5th at p. 240; *People v. Gerson, supra,* 80 Cal.App.5th at p. 1095; *People v. Garcia* (2022) 76 Cal.App.5th 887, 901.)

## B. *The Parties' Arguments*

The parties disagree about whether the instant case must be remanded for the court to determine whether defendant suffered a qualifying "trauma" that was a contributing factor to the commission of the robbery and would raise the presumption for the lower term under the provisions of section 1170, subdivision (b)(6)(A).

Defendant contends remand for imposition of the lower term is required because of the enactment of Assembly Bill No. 124, and the record does not clearly indicate the court would not have exercised the "greater discretion conferred by AB 124" since the lower term would have been the presumptive sentence because of his "significant childhood trauma."

In making this argument, defendant argues the documentary exhibits that he introduced in support of his sentencing motions "detailed the traumatic events in his childhood that could well have been deemed mitigating circumstances" and constituted "psychological, physical, or childhood trauma" under section 1170,

24.

subdivision (b)(6)(A).[8] Defendant asserts these exhibits showed he had "a very difficult childhood" because he was using marijuana by the time he was 13 years old, and his mother wrote that he 'didn't experience a normal childhood,' and his father, 'introduced [defendant], at a young age, to the drug world.' " Defendant further asserts these exhibits, particularly his mother's letter, showed he had mental health problems at an early age, he struggled with mental illness and drug use since he was 13 years old, he was diagnosed with bipolar disorder when he was 15 years old, he never received any treatment because his parents had a "volatile relationship," and instead used drugs based on the influence of his biological father. Defendant further argues that it "appears" he was having "an acute psychotic episode combined with drug use" when he committed the robbery in this case.[9]

---

[8] While defendant relies on Assembly Bill No. 124, we note that it is not independently operative. "During the 2021–2022 legislative term, three bills proposing changes to section 1170 in a variety of ways were introduced. They were Assembly Bill No. 124 (Stats. 2021, ch. 695, § 5), Assembly Bill No. 1540 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 719, § 2), and Senate Bill No. 567 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3). All three bills were passed by the Legislature in September 2021 and approved by the Governor and filed with the Secretary of State on October 8, 2021. Senate Bill No. 567 (2021–2022 Reg. Sess.) bears the highest chapter number and is presumed to be the last of the three approved by the Governor. (Gov. Code, § 9510.) As such, Senate Bill No. 567 (2021–2022 Reg. Sess.) prevails over Assembly Bill No. 124. (Gov. Code, § 9605, subd. (b).) To the extent there are conflicts between the three bills, Senate Bill No. 567 (2021–2022 Reg. Sess.) takes precedence. (*In re Thierry S.* (1977) 19 Cal.3d 727, 738–739 .…) As to subdivision (b)(6)(A) of section 1170, however, the substantive language in Assembly Bill No. 124, Senate Bill No. 1540 (2021–2022 Reg. Sess.), and Senate Bill No. 567 (2021–2022 Reg. Sess.) are not in conflict." (*Banner*, *supra*, 77 Cal.App.5th at p. 243, fn. 2 (conc. & dis. opn. of Detjen, J.); *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038; *People v. Jones* (2022) 79 Cal.App.5th 37, 45, fn. 11.)

[9] As previously noted, there is no evidence that defendant was evaluated for being under the influence or tested positive for drug or alcohol use at the time of his arrest. Officer Benavidez testified that he did not have to get defendant medically cleared when he took him into custody.

The People assert that defendant's mental health and drug problems do not qualify as "psychological, physical, and childhood trauma" as defined in section 1170, subdivision (b)(6)(A).

## C. *Banner*

Defendant's arguments are based on *Banner*, *supra*, 77 Cal.App.5th 226, where the defendant was convicted of two counts of attempted robbery. *Banner* held the trial court did not have a sua sponte duty to consider whether the defendant was eligible for mental health diversion under section 1001.36, even though the court stated it had reviewed " 'several hundred pages' of 'mental health records' " (*id.* at p. 233) and believed he had mental health issues, but concluded that the manner he was able to commit the crime indicated his mental health issues were " 'somewhat in abeyance at the time….' " (*Ibid.*) *Banner* rejected the defendant's alternate argument that counsel was prejudicially ineffective for failing to make a diversion motion because his attorney "did in fact offer mental health as a mitigating factor. The record was rife with information relating to [the defendant's] mental health. The court simply disagreed it was a significant factor in this crime." (*Id.* at p. 239, fn. omitted.)

As relevant to the instant case, *Banner* also addressed the defendant's separate argument that the matter had to be remanded for resentencing because of the subsequent enactment of Assembly Bill No. 124, and that evidence of his mental illness constituted "trauma" as defined by the amended version of section 1170, subdivision (b)(6)(A). (*Banner, supra*, 77 Cal.App.5th at p. 240.) A majority of this court agreed with the defendant and held remand was required:

> "[P]sychological trauma based on mental illness may be a circumstance qualifying for the lower term presumption in section 1170, subdivision (b)(6). To be clear, we do not hold mental illness alone qualifies for the lower term presumption. Psychological trauma must attend the illness, and *that* trauma must contribute to the crime under section 1170, subdivision (b)(6)." (*Id.* at p. 241.)

The People argued remand was not required since the trial court had considered defendant's evidence about his mental illness when it denied his motion for diversion. *Banner* disagreed and held the trial court's ruling on the diversion motion under section 1001.36 was based on a different standard than that required by section 1170, subdivision (b)(6)(A):

> "Under section 1001.36 mental health diversion, both conviction and imprisonment are entirely avoided. Under section 1170, subdivision (b)(6), neither conviction nor imprisonment are avoided, but instead there is a rebuttable presumption favoring a lower term prison sentence. A standard resulting in neither conviction nor imprisonment is properly more onerous than a standard that potentially mitigates a prison sentence.

> "Because the respective statutory standards are different, the trial court's conclusion [the defendant's] mental illness was not a *significant* factor in the crime does not subsume a finding it was a lesser *contributing* factor. Hypothetically, a court could find psychological trauma induced by mental illness a contributing factor in a crime notwithstanding the fact the person was lucid at the time of the crime. [Citation.]

> "We recognize the trial court did not formally find [the defendant's] mental illness a factor in mitigation at the sentencing hearing. The California Rules of Court list 'suffering from a mental or physical condition that significantly reduced culpability for the crime' as a mitigating factor. [Citation.] The Supreme Court has made clear mental illness may underlay a crime without *also* significantly reducing culpability. [Citation.] Accordingly, not finding mental illness a mitigating factor under the California Rules of Court does not preclude a separate finding psychological trauma is a contributing factor to the crime under section 1170, subdivision (b)(6).

> "In a similar vein, we generally expect arguments developing mental illness as mitigation to appear in the record in one form or another. Classic examples include plea negotiations, trial proceedings, and sentencing hearings. *We believe, however, neither [the defendant] nor the court had a meaningful incentive to assess whether mental illness was a limited but nonetheless 'contributing factor' in the crime.*" (*Banner, supra*, 77 Cal.App.5th at pp. 241–242, first italics in original, latter italics added, fn. omitted.)

27.

Justice Detjen's dissent in *Banner* stated there was no evidence the defendant fell within the class of persons defined by section 1170, subdivision (b)(6)(A) because of his history of mental illness, and declined to add "a group of persons – in this case, defendants who have a mental illness, but no evidence of psychological trauma – to the class of persons designated by the Legislature to benefit" from Assembly Bill No. 124's sentencing amendment. (*Banner, supra*, 77 Cal.App.5th at pp. 244, 246 (conc. & dis. opn. of Detjen, J.).)

> "The plain language of the amended statute provides no support for the majority's conclusion. [¶] The statute does not list mental illness in the identified class of persons. It lists: '[P]sychological … trauma, including, … abuse,' 'psychological … trauma, including, … neglect,' 'psychological ... trauma, including, ... exploitation,' and 'psychological … trauma, including, … sexual violence.' [Citation.] It does not read, psychological trauma, *including mental illness.* If it did, the statute would list mental illness among the conditions that constitute psychological trauma. The majority recognizes this when they state they 'do not hold mental illness alone qualifies for the lower term presumption.' [Citation.]
>
> "The majority then concludes that 'psychological trauma stemming from mental illness' [citation], and 'psychological trauma based on mental illness' [citation], and '[p]sychological trauma [that] attend[s] [mental] illness' [citation], requires remand for resentencing under section 1170, subdivision (b)(6)(A) opining that 'it strains credulity to conclude mental illness cannot result in psychological trauma.' [Citation.] [¶] I do not disagree that psychological trauma can 'stem[ ] from,' be 'based on,' or 'attend' mental illness. The problem is there is *no* evidence in the record of psychological trauma." (*Id.* at pp. 244–245.)

The dissent further found that by remanding for resentencing under Assembly Bill No. 124 "when there is evidence of mental illness, but no evidence of psychological trauma, because there *may be* psychological trauma, the majority broadens the class of persons beyond those listed in the plain language of the statute," and the majority's construction "swallows the rule and leads to absurd results." (*Banner, supra*, 77 Cal.App.5th at p. 246 (conc. & dis. opn. of Detjen, J.).)

28.

"Given [the majority's] construction, it would follow that: a defendant with a prior prison term should have his or her case remanded for resentencing because psychological trauma could well 'stem[] from' such an experience; or, when evidence in the trial court indicated a defendant took medication for back pain, the case should be remanded for resentencing as physical trauma may 'attend' such pain; or, when evidence suggests a defendant suffered the loss of a parent in childhood, remand for resentencing should occur as childhood trauma may be 'based on' such an event." (*Ibid*.)

**D.     *Analysis***

Defendant asserts the record in this case is similar to that reviewed in *Banner* and establishes that he suffered from mental health and drug problems both as a child and an adult that constituted psychological or childhood trauma that significantly contributed to his commission of the robbery in this case.

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, [our Supreme Court has] held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

Defendant was sentenced in April 2021, before section 1170, subdivision (b)(6)(A) became effective and, as a result, the court imposed the midterm without considering the newly enacted statutory presumption potentially available under the revised statute. In contrast to *Banner*, however, the entirety of the record shows that both defense counsel and the court had "a meaningful incentive to assess whether mental illness was a limited but nonetheless 'contributing factor' in the crime." (*Banner, supra*, 77 Cal.App.5th at p. 242.) The court considered the same evidence that defendant now relies on as allegedly showing "psychological" or "childhood trauma" under

section 1170, subdivision (b)(6)(A) and rejected all of defendant's sentencing motions for leniency.

We find that in contrast to *Banner*, remand is not required in this case. First, the record contains no evidence that defendant suffered from any "childhood trauma" aside from the diagnosis of his bipolar disorder, or that such "trauma" was a contributing factor in the commission of the robbery. While his exhibits stated that he was diagnosed with bipolar disorder and used drugs as a teen, and referred to his parents' difficult relationship, none of these exhibits described "childhood trauma" that was a contributing factor to his commission of the robbery.

Second, even assuming that *Banner* correctly held that "psychological" or "childhood" trauma may be based on mental illness and constitute a qualifying circumstance under section 1170, subdivision (b)(6)(A), this case is distinguishable from *Banner* because defendant fully developed the record as to his history of mental illness and drug use, and the court expressly addressed and rejected these arguments when it denied his numerous motions for leniency and imposed the midterm.

As set forth above, defendant's pretrial request to dismiss his prior strike conviction was based entirely on his history of drug abuse and mental health problems and supported by Dr. Zimmerman's competency report. At the sentencing hearing, the court fully considered defendant's lengthy sentencing motion and counsel's numerous arguments for "presentencing" diversion, his renewed request to dismiss the prior strike conviction so he could be place on probation, his claim there were unusual circumstances so he could still qualify for probation, and for imposition of the lower term. All of defendant's arguments were based on the extensive exhibits filed in support of his sentencing statement, consisting of the letters from his family and friends setting forth his history of mental health problems and drug use. These exhibits also constitute the basis for defendant's appellate arguments that his mental health and drug problems constituted trauma that was a contributing factor to his commission of the robbery

30.

The court heard extensive arguments on these contentions at the sentencing hearing, carefully considered the evidence of defendant's mental health history and drug problems, and denied all of defendant's sentencing motions, including whether the lower term was appropriate in this case. While the court acknowledged defendant's history of mental health problems and drug abuse, it did not find that these issues played any type of role in the commission of the robbery, and instead focused on defendant's use of the knife and that his offenses involved the escalating use of force.[10]

Finally, the court's decision to impose the midterm negates the potential application of section 1170, subdivision (b)(6)(A) to this case. As noted above, section 1170, subdivision (b)(1) states that when a statute specifies three possible terms, "the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." Subdivision (b)(2) states that the court may impose a sentence exceeding the middle term "only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial…." (§ 1170, subd. (b)(2).)

While section 1170, subdivision (b)(6) states the new presumption regarding the lower term at issue in this case, it also states the following prefatory language applicable in this case:

> "Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice,

---

[10] The defense exhibits submitted in support of his sentencing motions referred to an incident where defendant was stabbed in 2013, and that the incident resulted in "trauma" and made his "suspicious" of his surroundings. Based on the representations about defendant's age in his sentencing statement, he would have been 23 years old in 2013. Defendant has not cited this incident in support of his current claims about section 1170, subdivision (b)(6)(A).

31.

the court shall order imposition of the lower term is any of the following was a contributing factor in the commission of the offense ….” (§ 1170, subd. (b)(6).)

The court fully considered defense counsel's arguments and reviewed the exhibits about defendant's mental health and drug problems. It found one mitigating factor, that the value of the property taken was insignificant; and found multiple aggravating factors, including that defendant was previously an aider and abettor to a shooting, he was convicted of brandishing a weapon while on felony probation, and he personally committed the robbery and personally used a weapon in the commission of the robbery. Based on these findings, the court denied defendant's request for the lower term and imposed the midterm.[11]

The lower term need not be imposed when “the court finds that the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice.” (§ 1170 subd. (b)(6).) The court's findings on aggravating and mitigating circumstances, and its denial of defendant's motion for the lower term and decision to impose the midterm, clearly indicate the court would have reached the same conclusion to impose the midterm under the amended law and remand is not required.

---

[11] While the court did not impose the upper term, its findings on at least these three aggravating circumstances satisfy section 1170, subdivision (b)(2) since defendant admitted during his trial testimony that he had one prior conviction, the court found his prior conviction for shooting at an inhabited dwelling constituted a prior strike, the defense introduced the transcript of the plea hearing from that prior conviction, the court referred to documentary evidence that he was convicted of brandishing while on probation for that prior conviction, and the jury in this case found true the enhancement that he personally used a deadly or dangerous weapon in the commission of the instant robbery. (See, e.g., *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1109–1110.)

## II.     Imposition of the Fines and Fees

Defendant next contends the court improperly imposed the fines and fees in this case without finding he had the ability to pay those amounts as set forth in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).[12]

Defendant's sentencing hearing was held in April 2021, over two years after *Dueñas* was decided.  Nevertheless, defendant did not object to the court's imposition of the restitution fine and the fees.  Even before *Dueñas*, defendant had a statutory right to object to the court's imposition of the $2,100 restitution fine since it exceeded the statutory minimum of $300, and he did not do so.  (§ 1202.4, subds. (c), (d).)  Accordingly, defendant forfeited appellate review of his claim that the trial court erred when it imposed the restitution fine without determining his ability to pay.  In addition, by failing to object to the $2,100 restitution fine, defendant left no doubt he would not have challenged the court's imposition of the much lower fee assessments, even if he knew he had a right to do so under *Dueñas*.  (*People v. Montelongo* (2020) 55 Cal.App.5th 1016; *People v. Taylor* (2019) 43 Cal.App.5th 390, 399–400; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033; *People v. Smith* (2020) 46 Cal.App.5th 375, 395; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1154.)

In the alternative, defendant argues his attorney was prejudicially ineffective for failing to object to the fines and fees based on *Dueñas*, which held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before it imposes any fines or fees.  (*Dueñas, supra*, 30 Cal.App.5th at p. 1164.)

---

[12] The California Supreme Court is currently considering whether trial courts must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments; and if so, which party bears the applicable burden of proof.  (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 94–98, review granted Nov. 13, 2019, S257844.)

We disagree with the holding in *Dueñas.* As explained in *People v. Aviles* (2019) 39 Cal.App.5th 1055 (*Aviles*), we believe *Dueñas* was wrongly decided and an Eighth Amendment analysis is more appropriate to determine whether restitution fines, fees, and assessments in a particular case are grossly disproportionate and thus excessive. (*Aviles*, at pp. 1068–1072.) Under that standard, the fines and fees imposed in this case are not grossly disproportionate to defendant's level of culpability and thus not excessive under the Eighth Amendment. (*Id*. at p. 1072.) As the court stated at the sentencing hearing, it found the restitution fine of $2,100 was "commensurate with the seriousness of the crime charged."

Even if we agreed with *Dueñas*, defense counsel's failure to object based on that ruling was not prejudicial because defendant has the ability to pay the fines and fees over the course of his prison sentence. (*Aviles, supra*, 39 Cal.App.5th at pp. 1075–1077.) " ' "Ability to pay does not necessarily require existing employment or cash on hand." [Citation.] "[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." [Citation.] This include[s] the defendant's ability to obtain prison wages and to earn money after [her] release from custody.' " (*Id.* at p. 1076.)

We can infer from the instant record that defendant has the ability to pay the aggregate amount of fines and fees from probable future wages, including prison wages. (*Aviles, supra*, 39 Cal.App.5th at p. 1076; *People v. Ellis* (2019) 31 Cal.App.5th 1090, 1094; *People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397.) In addition, there is nothing in the record to show that defendant would be unable to satisfy the fine and fees imposed by the court while serving his prison term, even if he fails to obtain a prison job. While it may take defendant some time to pay the amounts imposed in this case, that circumstance does not support his inability to make payments on these amounts from either prison wages or monetary gifts from family and friends during his prison sentence.

34.

(See, e.g., *People v. Potts* (2019) 6 Cal.5th 1012, 1055–1057; *People v. Lewis* (2009) 46 Cal.4th 1255, 1321; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505.)

We thus conclude that based on the record before this court, defendant has the ability to pay the fines and fees, and counsel's failure to object was not prejudicial.

## **DISPOSITION**

The judgment is affirmed.


POOCHIGIAN, J.

WE CONCUR:


LEVY, Acting P. J.


DETJEN, J.